UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RICHARD MORSE | CIVIL ACTION |
| VERSUS | NO. 19-9240 |
| BOARD OF SUPERVISORS LOUISIANA STATE UNIVERSITY AGRICULTURAL AND MECHANICAL COLLEGE AND LOUISIANA STATE UNIVERSITY SCHOOL OF MEDICINE, AND LSU HEALTH SCIENCES CENTER OF NEW ORLEANS | SECTION "R" (4) |

### ORDER AND REASONS

Before the Court is defendant Louisiana State University's motion for summary judgment.[1]  Because plaintiff has not met his burden of establishing a prima facie case, the Court grants the motion.

**I.  BACKGROUND**

This case arises from the discharge of a doctor.  Richard Morse worked as a child psychiatrist at Louisiana State University School of Medicine for forty years.[2]  From 2012 to 2017, Morse taught courses in child and

---

[1]  R. Doc. 11.
[2]  R. Doc. 1-1 at 3 ¶¶ 6, 9.

adolescent psychiatry, and did clinical work at the Algiers Mental Health Clinic.[3] This work involved supervision of fourth- and fifth-year medical residents.[4]

Although Morse's career was mostly distinguished and without incident, problems began to arise in the years before his termination. In 2015, an intern of Vietnamese descent filed a Title IX complaint against Morse, alleging he created a hostile work environment by discussing Vietnamese brothels and prostitutes.[5] LSU conducted an investigation, and determined that there was a hostile environment as to the intern, but that Morse did not have malicious intent in creating the environment.[6]

LSU later instituted a Title IX investigation involving the psychiatry department, which began in June 2017.[7] Much of this investigation focused on a different doctor who worked closely with Morse and who residents complained subjected them to sexual harassment and a hostile environment.[8] This investigation led to a June 29 meeting between the residents and Dr. Howard Osofsky, Chair of the LSU Medical School

---

[3]   *Id.* at 4 ¶ 12.
[4]   *Id.* at 5 ¶¶ 19-20, 24.
[5]   R. Doc. 11-5 at 11.
[6]   *Id.* at 17.
[7]   *See, e.g.*, R. Doc. 14-6 at 13.
[8]   R. Doc. 14-6 at 13-30 (Title IX investigation notes).

Department of Psychiatry.[9]  At this meeting, concerns were raised about Morse.  The residents stated that Morse made them feel uncomfortable, particularly when he would discuss the ongoing investigation.[10]

Then, in July 2017, Morse gave a presentation to fourth-year residents entitled "culture shock" that detailed the experiences residents may expect when working on the Westbank of New Orleans.[11]  The residents felt that the presentation was culturally insensitive, as Morse used terms like "ghetto" and "those people" to describe African Americans on the Westbank.[12]  The residents also took issue with Morse's tone regarding the African-American women who worked as social workers at the Algiers Clinic, whom he purportedly referred to as "those girls."[13]  Morse gave the presentation in years past without complaint.[14]  The residents did not file a formal complaint or raise their concerns with Morse.[15]  However, these concerns were reported to Osofsky.[16]

---

[9]    *Id.* at 34-37.
[10]   *Id.* at 35.
[11]   R. Doc. 14-3 at 5 ¶¶ 28, 30.
[12]   *Id.* at 4 ¶ 26; R. Doc. 11-5 at 2 ¶ 13.
[13]   *See* R. Doc. 11-5 at 2 ¶ 13; R. Doc. 11-8 at 2 ¶ 17.
[14]   R. Doc. 14-3 at 5 ¶ 31.
[15]   *Id.* at 5 ¶ 32.
[16]   R. Doc. 11-5 at 21.

Other concerns were raised about Morse's performance. One doctor accused Morse of not reporting suspected child abuse cases.[17] Kristine Olivier, another doctor in LSU's Psychiatry Department, received complaints that Morse took an extended amount of time to do psychiatric screenings, and that Morse failed to use the clinic's prescription-filling program.[18] Olivier reported these concerns to Osofsky.[19]

On October 10, 2017, Osofsky met with Morse and informed him that his appointment was not going to be renewed and would expire on December 31, 2017.[20] According to Morse, Osofsky told Morse he was being terminated because he failed to keep up with the modern direction of the department, because of concerns that residents were uncomfortable with Morse's supervision and could file a complaint, and another reason he would not disclose.[21] At the time of his termination, Morse was eighty-two years old,[22] and Osofsky was seventy-five years old.[23] Morse filed an internal grievance with LSU, and later filed a claim with the EEOC.[24] At Morse's request, the

---

[17] *Id.* at 2 ¶ 21.
[18] R. Doc. 11-8 at 1 ¶ 7.
[19] *Id.* at 1-2 ¶¶ 5, 12.
[20] *See* R. Doc. 11-5 at 2 ¶ 22.
[21] R. Doc. 1-1 at 8 ¶ 36.
[22] *See* R. Doc. 14-3 at 2 ¶ 12.
[23] R. Doc. 11-5 at 3 ¶ 24.
[24] R. Doc. 1-1 at 8-9 ¶¶ 38, 49.

EEOC issued a right to sue letter on February 19, 2019.[25] Morse then sued LSU, alleging he was fired on account of his age, in violation of federal and state law.[26] LSU contends that it terminated Morse for "unacceptable comments" and deficient performance.[27]

## II. LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."

---

[25] *Id.* at 13 ¶ 62.
[26] *See generally* R. Doc. 1-1.
[27] R. Doc. 11-1 at 13.

*Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)). "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at

325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322 (emphasis added))).

## III. DISCUSSION

Plaintiff brings a claim under the Age Discrimination in Employment Act, 29 U.S.C § 621, *et seq*. The ADEA states that "it shall be unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). To establish an ADEA claim, a plaintiff may rely upon direct evidence or circumstantial evidence. *Sandstad v. CV Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002). Plaintiff acknowledges he relies solely on circumstantial evidence.[28] The Court therefore applies the

---

[28] R. Doc. 14 at 11.

burden-shifting framework that the Supreme Court laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.*

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case. *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005). Once the plaintiff has done so, the "burden shifts to the employer to produce a legitimate, nondiscriminatory reason for her termination." *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). The burden then shifts back to the plaintiff, who must produce "substantial evidence that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Id.* "A decision as to whether judgment as a matter of law is appropriate ultimately turns on 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.'" *Id.* at 579 (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)).

### A. Prima Facie Case

In order to establish a prima facie case of age discrimination, a plaintiff must show that "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was

8

either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010).

The parties do not dispute the first three elements. Rather, it is only the fourth element—whether Morse was replaced by someone outside of the protected class or otherwise discharged because of his age, that is in dispute. Here, plaintiff argues that he was both replaced by someone younger and otherwise discharged because of his age.

1. *Replaced by Someone Younger*

The parties dispute whether Morse was replaced by someone younger. Morse argues he had two positions at LSU. First, he provided medical services at the Algiers clinic. Second, he was a member of LSU's supervising faculty. Upon Morse's termination, his patients were assigned to various residents under the supervision of Olivier.[29] Osofsky testified at his deposition that the supervision course that Dr. Morse taught is now taught by Cody Roi, a doctor under forty, although it has "changed considerably."[30]

---

[29] R. Doc. 11-8 at 2 ¶ 8 (affidavit of Olivier stating that "[u]pon Dr. Morse's nonrenewal of December 31, 2017, the cases which were being handled by Dr. Morse were divided amongst and assigned to the residents working at the Algiers Clinic, with direct supervision by Dr. Olivier").
[30] R. Doc. 14-11 at 20.

9

"Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement." *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992); *see also Hardy v. Shell Chem. Co.*, 693 F. Supp. 2d 611, 620 n.25 (E.D. La. 2010) ("When a plaintiff has been terminated and his job duties are reassigned to existing employees . . . the employee has not been replaced for purposes of establishing his prima facie case."). Plaintiff does not dispute that this proposition of law forecloses an argument that he was replaced in his clinical duties. Rather, Morse argues that because the clinical supervision course he taught is now taught by Roi, a much younger doctor, he was replaced with respect to his teaching duties.

Morse's attempt to characterize his employment as two separate positions is unconvincing. Looking at Morse's position as a whole, including his teaching and clinical duties, his duties were spread among remaining employees, which included residents and Roi. That Morse's position was a unitary one—which included both teaching and clinical duties—is bolstered by his contract, which lays out both clinical and teaching duties for the same position.[31] Indeed, plaintiff's complaint acknowledges that "Dr. Morse's teaching obligations were inseparable from his clinical services."[32] And

---

[31] *See* R. Doc. 11-5 at 8.
[32] *See* R. Doc. 1-1 at 4 ¶ 18.

10

because "[s]preading the former duties of a terminated employee among the remaining employees does not constitute replacement," *Lilley* at 752, Morse has failed to produce evidence establishing a disputed issue of material fact as to whether he was replaced by someone younger.

### 2. *Otherwise Discharged Because of His Age*

Morse also argues that he can establish a prima facie case as he was "otherwise discharged because of his age." *Jackson*, 602 F.3d at 378. The evidence plaintiff points to in order to demonstrate that he was discharged because of his age falls into two categories. First, Morse argues Osofsky considered Morse's cognitive decline in deciding to terminate him, and that this was a form of age discrimination. Second, Morse argues that certain comments from younger residents regarding generational differences make clear that Morse was fired because of his age.

There is some evidence in the record that indicates Osofsky believed Morse was cognitively declining. For example, the faculty investigation report into Morse's EEOC complaint states: "Dr. Osofsky also expressed concerns that he had regarding Dr. Morse's cognitive function. He cites that Dr. Morse may take up to 2 ½ hours to evaluate a patient and formulate a treatment plan, an activity that should take only a fraction of the time."[33]

---

[33]  R. Doc. 14-6 at 57.

11

Further, at his deposition Osofsky testified that he had concerns about Morse's cognitive functioning, as at their hour-long October 10th meeting, Morse asked the same questions over and over again.[34] Olivier testified at her deposition that Osofsky told her he thought Morse's cognitive function was declining.[35]

Morse argues these concerns about cognitive decline are a veiled form of age discrimination. However, "[w]hile a person's memory or cognitive abilities may be 'correlat[ed]' or 'empirically intertwined with age,' a decision to terminate [a plaintiff] based on those abilities would be one motivated by 'some feature other than [plaintiff's] age' and, as such, would not violate the ADEA." *Parron v. Hebert*, No. 17-3848, 2018 WL 2538221, at \*7 (S.D.N.Y. May 18, 2018) (citing *Criley v. Delta Air Lines, Inc.*, 119 F.3d 102 (2d Cir. 1997)); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) (holding that when an employer's decision "is wholly motivated by factors other than age" the ADEA is not violated "even if the motivating factor is correlated with age, as pension status typically is"). Here, Osofsky's concerns regarding Morse's cognitive decline do not implicate Morse's age, but rather Morse's performance and in particular the length of Morse's patient

---

[34] *See* R. Doc. 11-7 at 12-13.
[35] R. Doc. 14-8 at 18.

12

interviews. Thus, although cognitive decline may be "correlated with age," *Biggins* at 611, here plaintiff points to no evidence to demonstrate that Osofsky's concern was in fact a form of age discrimination.

Morse also argues that Osofsky fired him to satisfy the "illegitimate preferences" of younger residents. In the course of the Title IX investigation LSU undertook in the summer of 2017, one resident, Lauren Larose, stated that she "wanted at a minimum for the environment to change" and that "[u]ntil this year, it's been old white men running the program."[36] Another resident, Michelle Maher, stated that "[t]he residents are pleased that two young faculty members have been brought on. This is a nice change from the old white men running the program."[37] During an interview with Osofsky, Larose acknowledged there was "somewhat a divide between female and male faculty and generations" and Daniel Waldmann, another resident, agreed there were "generational differences."[38]

LSU argues that these statements are only "stray remarks" and therefore cannot be competent summary judgment evidence. In analyzing stray remarks in the context of indirect evidence cases, the Fifth Circuit has held that to be relevant "the comments must show (1) discriminatory animus

---

[36] R. Doc. 14-6 at 20.
[37] *Id.* at 28.
[38] *Id.* at 35.

13

(2) on the part of a person who is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Squyres v. Heico Comps., L.L.C.*, 782 F.3d 224, 236 (5th Cir. 2015) (citing *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012)). "Comments that do not meet these criteria are 'stray remarks' and, standing alone, are insufficient to defeat summary judgment." *Jackson*, 602 F.3d at 380. Statements that do meet these criteria can be used to establish a prima facie case. *See Goudeau v. National Oilwell Varco, L.P.*, 793 F.3d 470, 475-76 (5th Cir. 2015) (holding that ageist comments by a supervisor, such as referring to the plaintiff as an "old fart," among other evidence, helped establish a prima facie case).

LSU contends that because these statements were made by residents, and not Osofsky, they were not made by an individual with influence or leverage over the employment decision at issue. Morse does not dispute that Osofsky was the "solitary decision-maker."[39] Rather, he counters that the residents had sufficient influence and leverage over Osofsky that their comments are not stray remarks and instead are competent summary judgment evidence. The Fifth Circuit has found sufficient influence or leverage over a decisionmaker when a speaker is in a position to in some way

---

[39] R. Doc. 14 at 1.

14

control the decisionmaker. For example, in *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 578 (5th Cir. 2003), the Fifth Circuit held that two members of "upper management," one of whom was the president of the defendant company, had sufficient leverage over a decisionmaker that their statements regarding the plaintiff's age could be attributed to him. But the Fifth Circuit has often found co-workers, even co-workers who used to be managers, lack the necessary influence or control over decisionmakers in employment decisions. *See, e.g., Long v. Eastfield Coll.*, 88 F.3d 300, 306 (5th Cir. 1996) ("[O]rdinary employees do not have control over the employment status of co-employees."); *McMicahel v. Transocean Offshore Deepwater Drilling Inc.*, 934 F.3d 447, 458-59 (5th Cir. 2019) (holding that the comments of a former manager who had been transferred could not be attributed to a current manager who made the decision to terminate the plaintiff); *Matthews v. United Bhd. of Carpenters & Joiners of Am.*, 228 F. App'x 436, 440 (5th Cir. 2007) (holding that the comments of a former lead manager who supervised the plaintiff could not be attributed to the current manager who made the decision to terminate the plaintiff).

Here, the comments Morse points to were made by medical residents during investigations into purportedly improper behavior. Notably, these comments were not directed at Morse, nor do they specifically reference

15

Morse. And far from having leverage over Osofsky, the residents were still taking classes and under the supervision of a variety of more senior doctors, including Morse. Indeed, Osofsky ran the entire department of psychiatry at LSU Medical School. Moreover, at his deposition Osofsky noted that in a small residency such as this one, residents were careful about what they put in their evaluations of their supervisors such as Morse, since they could be easily identified.[40] This indicates the residents' awareness of the power the faculty had over them, contrary to Morse's suggestion that they had power over the faculty. The residents were therefore not in a position to have the sort of "influence or leverage" over Osofsky such that their statements should be attributable to him. The residents' comments are therefore "stray remarks" and are insufficient to defeat a motion for summary judgment.

### 3.  *Inference Against Age-Based Discrimination*

The Court's finding that plaintiff fails to demonstrate a prima facie case is bolstered by the fact that Osofsky was seventy-five years old at the time he fired Morse, and therefore in the same protected class as Morse.[41] This supports an inference that discrimination is unlikely the reason for plaintiff's termination. *See McMichael*, 934 F.3d at 460 ("On numerous occasions, this

---

[40]  *See* R. Doc. 14-11 at 14.
[41]  R. Doc. 11-5 at 3 ¶ 23.

16

court has held that discrimination is less likely when the supervisor is in the same protected class as the plaintiff."); *Kelly v. Costco Wholesale Corp.*, 632 F. App'x 779, 783 (5th Cir. 2015) ("[The plaintiff's] membership in the same protected class as [the supervisor who decided to terminate him] bolsters the inference that age discrimination was not the reason for his termination.").

Morse contends that's Osofsky's age is irrelevant, as he adopted the discriminatory preferences of the younger residents, and therefore acted as the "cat's paw" of their discriminatory preferences. But this is only another version of the argument that the residents' statements should be imputed to Osofsky. And cases finding that a decisionmaker acted as the "cat's paw" of a discriminatory employee have involved a discriminatory employee with power not held by the residents here. *See, e.g., Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226-27 (5th Cir. 2000) (holding that the decision-maker acted as the "cat's paw" of a discriminatory employee who held such "great informal power" in the company that he effectively became the decision-maker with regard to hiring decisions."). The Court therefore finds that Osofsky's age is relevant and supports an inference that age discrimination was unlikely a cause for Morse's termination.

17

Because the Court has found that plaintiff does not establish a prima facie case, it does not reach the remaining steps in the *McConnell Douglas* framework.

### B. Louisiana Employment Discrimination Law

Defendant moves to dismiss plaintiff's claim under the Louisiana Employment Discrimination Law. The LEDL prohibits age discrimination. *See* La. R.S. 23:312 (prohibiting age discrimination). With respect to claims of age discrimination, the LEDL is modeled after federal law and should be construed in light of federal precedent. *See, e.g.*, *O'Boyle v. La. Tech Uni.*, 741 So. 2d 1289, 1290 (La. App. 2 Cir. 1999) (holding that the Louisiana Act "mirrors the federal ADEA and should be construed in light of federal precedent"). Indeed, Louisiana courts apply the same *McConnell Douglas* burden-shifting framework when analyzing claims of age discrimination under the Louisiana law. *See Taylor v. Oakbourne Country Club*, 663 So.2d 379, 383-84 (La. App. 3 Cir. 1995). For the reasons explained above, plaintiff's claim for age discrimination under the ADEA cannot pass muster at the summary judgment stage. And for the same reasons, plaintiff's LEDL claim for age discrimination cannot survive summary judgment and must be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS defendant's motion. Plaintiff's claims are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this __28th__ day of April, 2020.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE